IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHELSEA PURCHASE, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 23-CV-2735-SPM |
| v. | |
| FACEAPP INC. and FACEAPP TECHNOLOGY LIMITED, | |
| Defendants. | |

## MEMORANDUM & ORDER

## McGLYNN, District Judge:

Plaintiff Chelsea Purchase ("Purchase") brings a purported class action against defendants FaceApp Inc. ("FA"), and FaceApp Technology Limited ("FTL") for alleged violations of the Illinois Biometric Privacy Act ("BIPA"), codified at 740 ILCS §14/1, *et seq*. (Doc. 1). Pending before the Court are two motions that were originally filed as Motions to Compel Arbitration or, alternatively, to Dismiss. (Docs. 22, 34). However, on August 19, 2024, the defendants withdrew the motions to dismiss, leaving only the issue of arbitration to the Court. (Doc. 46). For the reasons set forth below, the Court **GRANTS** the motions to compel arbitration, and further stays this case pending the outcome of the arbitration.

### The Illinois Biometric Information Privacy Act

The Illinois General Assembly enacted the Illinois Biometric Information Privacy Act ("BIPA"), in 2008 to protect a person's privacy interests in his "biometric identifiers", which includes fingerprints, retina and iris scans, hand scans and facial

geometry. 740 ILCS 14/1, *et seq.* (2008); *Fox v. Dakkota Integrated Systems, LLC.,* 980 F.3d 1146 (2020). BIPA was created in response to the growing use of biometrics "in the business and security screening sectors". 740 ILCS 14/5. In fact, the legislative findings refer to the immutability of biometric identifiers and the risk of identity theft, and state the following, "Biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." 740 ILCS 14/5(c). Because "the full ramifications of biometric technology are not fully known", the General Assembly found that "the public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." *Id.* §§14/5 (f)-(g).

Section 15 of the Act comprehensively regulates the collection, use, retention, disclosure and dissemination of biometric identifiers. 740 ILCS 14/15. Specifically, § 15(a) of BIPA states:

> "A private entity in possession of biometric identifiers or information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever comes first." 740 ILCS 15/15(a).

Section 15(b) of the Act deals with informed consent and prohibits private entities from collecting, capturing, or otherwise obtaining a person's biometric

identifiers or information without the person's informed written consent. *Id.* § 15(b). In other words, the collection of biometric identifiers or information is barred unless the collector first informs the person "in writing of the specific purpose and length of term for which the data is being collected, stored, and used" and "receives a written release" from the person or his legally authorized representative. *Id.*

## PROCEDURAL HISTORY

On August 8, 2023, Purchase filed this class action complaint "in order to hold Defendants accountable for their BIPA violations and to recover statutory damages for the unauthorized collection, storage, and use of their biometric information in violation of BIPA". (Doc. 1, ¶8). Within the complaint, Purchase identified the following proposed class:

> **All persons who, while residing in Illinois, had their biometric identifiers collected, captured, received, or otherwise obtained by FaceApp.** (Id., ¶33).

On October 13, 2023, the parties filed a stipulation regarding pleading timeline and potential briefing schedule. (Doc. 13). On October 17, 2023, the Court granted the extensions of time and entered the proposed schedule. (Doc. 19).

On November 13, 2023, FA filed its motion to compel arbitration or, alternatively, to dismiss, along with memorandum of law and two supporting affidavits. (Docs. 22-24). Within the motion, FA contends that there are many deficiencies in Purchase's complaint; however, the main argument is that Purchase agreed to submit any claims to "binding and final arbitration". (Doc. 22). FA also argues that Purchase agreed that she would not pursue any claims as a plaintiff in a class action and that BIPA is inapplicable. (Id.).

On January 18, 2024, following an extension of time, Purchase filed her memorandum in opposition to FA's motion to compel arbitration or, alternatively, to dismiss the complaint. (Doc. 28). Purchase asserted that she never agreed to arbitrate any of her claims and that FA failed to meet its burden to show an agreement. (*Id.*). Purchase also argued that the complaint is plausible on its face so the motion to dismiss must be denied. (Id.).

On February 1, 2024, FA filed a reply in support of its motion, raising three main arguments. (Doc. 33). First, FA contended that there was an agreement to arbitrate. (Id.). Second, FA contended that dismissal was appropriate because the complaint is not plausible on its face. (Id.). Third, FA contended that Purchase waived class claims. (Id.).

On February 26, 2024, FTL filed its motion to compel arbitration or, alternatively, to dismiss the complaint, along with incorporated memorandum of law and supporting affidavit. (Docs. 34, 35). Many of the arguments surrounding arbitration are similar to those raised by FA, but the arguments on dismissal vary in that FTL contends that this Court has neither general nor specific personal jurisdiction over it. (Id.).

On March 28, 2024, Purchase filed a memorandum in opposition to FTL's motion incorporating the arguments raised against compelling arbitration. (Doc. 37). With respect to FTL's argument regarding dismissal on jurisdictional grounds, Purchase requested limited jurisdictional discovery and a stay of 90 days to do so. (Id.).

On April 11, 2024, FTL filed its reply. First and foremost, FTL claimed that

Purchase's arguments were flawed and that arbitration should be compelled. (Doc. 38). FTL further claimed that the Court did not even need to reach the jurisdictional argument because of the binding and valid arbitration agreement. (Id.).

On April 29, 2024, a hearing was held on the aforementioned motions. (Doc. 40). At that time, the parties argued their respective positions as to arbitration. (See Doc. 42 – transcript of hearing). During the hearing, Purchase reiterated her request to conduct limited discovery. Consequently, on May 2, 2024, Purchase was granted leave to conduct limited jurisdictional discovery; therefore, this matter was stayed and the parties were ordered to provide the Court with a status update before July 1, 2024. (Doc. 41).

On July 1, 2024, the parties submitted a status report advising that jurisdictional discovery had not yet been propounded, although plaintiff advised that she would "formally tender jurisdictional discovery to Defendants within twenty-one (21) days." (Doc. 43). The next day, July 2, 2024, the Court expressed its frustration with the delay - admonishing that the case was stayed 60 days prior and Ordering Purchase to propound discovery within 10 days, or by July 12, 2024. (Doc. 44). The parties were further Ordered to provide another status report to the Court in six weeks. (Id.).

On August 19, 2024, the parties submitted another status report, within which defendants withdrew the alternatives to the motions to compel, i.e., the motions to dismiss. (Doc. 46). Accordingly, on August 23, 2024, the stay was lifted and the parties were granted ten (10) days within which they could file a short brief supplementing their positions regarding the pending motions to compel arbitration. (Doc. 47).

On September 3, 2024, Purchase filed her supplemental brief against arbitration. (Doc. 49). On that same date, defendants filed their supplemental brief in support of their motions. (Doc. 50). Defendants argued that the motions to compel arbitration should be granted while Purchase argued that the motions should be denied because genuine issues of fact precluded compelling arbitration.

## FACTUAL BACKGROUND

The facts alleged by Purchase are accepted as true for purposes of defendants' motions[1]. FED. R. CIV. P. 10(c); *Arnett v. Webster,* 658 F.3d 742, 751-52 (7th Cir. 2011). This Court will summarize what it deems necessary to address this motion.

Purchase is a resident of St. Clair County, Illinois. (Doc. 1, ¶ 9). FA is a domestic corporation with its headquarters in Delaware. (Doc. 1, ¶10). FTL is a foreign corporation with its headquarters in Cyprus. (Doc. 1, ¶11).

In 2017, defendants launched FaceApp, a photo and video editing application available for download through iOS and Android devices. (Doc. 1, ¶1). Purchase contends that the US government expressed concern over FaceApp and Defendants' abuse of U.S. consumer privacy rights, including those covered by BIPA. (Doc. 1, ¶2). Purchase further contends that defendants, in direct violation of the prongs of BIPA, have and/or are "actively collecting, storing, and using the biometric information of millions of individuals without any written notice or informed written consent". (Doc. 1, ¶6). As such, Purchase filed this action individually and on behalf of a proposed class "to hold Defendants accountable for their BIPA violations and to recover

---

[1]The factual information was taken directly from the complaint (Doc. 1) and will be cited accordingly.

statutory damages for the unauthorized collection, storage, and use of their biometric information in violation of BIPA." (Doc. 1, ¶8).

Purchase has been a user of FaceApp for several years and has uploaded numerous photographs that include images of her face. (Doc. 1, ¶29). Purchase claimed that FaceApp created biometric identifiers and/or information of her face that it used and stored without her authorization. (Doc. 1, ¶30). She further claimed that she did not have notice that FaceApp would collect, store or use her biometric information and denied providing informed consent, in writing or otherwise. (Doc. 1, ¶¶31, 32).

In addition to asserting her own cause of action, Purchase's lawsuit is also brought pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the following proposed class:

> **All persons who, while residing in Illinois, had their biometric identifiers collected, captured, received, or otherwise obtained by FaceApp.** (Doc. 1, ¶33).

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995). Section 2 of the FAA provides that "an agreement in writing to submit to arbitration an existing controversy ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision "embodies both a 'liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.' " *Gore v. Alltel Communications, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012).

Under the FAA, "arbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017). As the party seeking arbitration, Defendant[s] bear the burden of proving that Plaintiff "agreed to arbitrate the claim[s] asserted here." See also *Zurich American Ins. Co. v. Watts Industries, Inc.*, 466 F.3d 577, 580 (7th Cir. 2006). "To decide this question, courts apply an evidentiary standard similar to the one that applies at summary judgment, meaning that if the party seeking arbitration offers sufficient evidence to allow a factfinder to conclude that the parties agreed to arbitrate, the party opposing arbitration must identify facts showing a genuine dispute as to the existence of the agreement." *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002)). "[O]nce an enforceable arbitration contract is shown to exist, questions as to the scope of arbitrable issues should be resolved in favor of arbitration." *Scheurer*, 863 F.3d at 752 (citing *Moses H. Cone*, 460 U.S. at 24-25) ("Once it is clear, however, that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law.").

## ANALYSIS

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995). The Act "embodies both a 'liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.' " *Gore v. Alltel*

*Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).

The Supreme Court has held that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Technologies v. Communications Workers of America,* 475 U.S. 643, 648 (1986). Indeed, while arbitration is a way to resolve disputes, arbitration is restricted to those disputes that the parties have agreed to submit to arbitration. See *Coinbase, Inc. v. Suski,* 602 U.S. ___, 144 S.Ct. 1186, 1192 (2024).

Defendants contend that arbitration must be compelled because they have provided evidence that (1) Purchase entered into a written agreement to arbitrate (2) Purchase's BIPA claims fall within the scope of the arbitration agreement; and, (3) that Purchase has refused to arbitrate. *See Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). Purchase submitted numerous objections to arbitration. (Doc. 49). Purchase first argued that general issues of fact exist to preclude arbitration – specifically because defendants have published three distinct Terms of Use ("TOU") with dates in 2017, 2019, and 2023, respectively, and there is no evidence as to which applies in this case. (Doc. 49, p. 3). Purchase then claimed that there was no mutual assent, raising the argument that this was a "browsewrap" agreement, not a "clickwrap" agreement. (Id., p. 6). Purchase also asserted that ambiguities preclude arbitration. (Id., p. 8). Finally, Purchase contended that, even if an arbitration clause exists, her claims are not within the scope of said agreement. (Id., p. 10).

I.      **MOTIONS TO COMPEL**

**Written Agreement to Arbitrate**

At Step 1, the undersigned must determine whether there was a valid contract, i.e. agreement to arbitrate, between Purchase and defendants. *See Gen.Ass'n of Regular Baptist Churches v. Scott*, 549 F.App'x 531, 533 (7th Cir. 2013). In determining whether a valid arbitration agreement exists between parties, federal courts apply the state law principles of contract formation. *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F. 3d 705, 711 (7th Cir. 2019). An enforceable contract in Illinois requires "an offer, acceptance, consideration, and mutual assent." *Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011). It is important to note that a court, in deciding whether the parties have agreed to arbitrate, is not to rule on the potential merits of the underlying claims. *Id.*

**A. TOU**

First and foremost, there is no merit to Purchase's claims that defendants have not shown which TOU applies. Illinois Courts allow parties to agree to authorize one party to modify a contract unilaterally. S*ee, e.g.*, *Williams v. TCF Nat'l Bank*, 2013 WL 708123, at *9 (N.D. Ill. Feb. 26, 2013) ("In Illinois ... unilateral modification clauses are enforceable") (citing *Garber v. Harris Trust & Sav. Bank*, 104 Ill.App.3d 675 (Ill. App. Ct. 1982)); *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 258 (Ill. 2006) (in Illinois, parties may "expressly reserve the right to unilaterally modify terms and conditions of the agreement, at any time, without notice").

The 2017 TOU at "17. Changes to These Terms"[2] states as follows:

---

[2] The Court notes that "17. Changes to these terms" is conspicuously in boldface and a larger font than the paragraph set

"We may make changes to these Terms from time to time. If we make changes, we will post the amended Terms to our Services and update the "Last Updated" date above. We may also attempt to notify you by sending an email notification to the address associated with your account, if any, or providing notice through our Services. Unless we say otherwise in our notice, the amended Terms will be effective immediately and your continued access to and use of our Services after we provide notice will confirm your acceptance of the changes. If you do not agree to the amended Terms, you must stop accessing and using our Services."

The next TOU, which was updated on December 3, 2019 states on the first page,

"PLEASE NOTE THAT THE AGREEMENT IS SUBJECT TO CHANGE BY FACEAPP IN ITS SOLE DISCRETION AT ANY TIME. When changes are made, we will make a new copy of the Agreement available at our website and within our mobile application. We will also update the "Last Updated" date at the top of the Agreement. If we make any material changes, we will also send push notification or show a pop-up to you via the FaceApp application. Any changes to the Agreement will be effective immediately for new users of the website, the mobile application and/or the Services and will be effective thirty (30) days after posting notice of such changes on the website for existing users, provided that any material changes shall be effective for existing users upon the earlier of thirty (30) days after posting notice of such changes on the website or thirty (30) days after dispatch of the push notification of such changes. We may require you to provide consent to the updated Agreement in a specified manner before further use of the website, the mobile application and/or the Services is permitted. If you do not agree to any change(s) after receiving a notice of such change(s), you shall stop using the Services, including the website and the mobile application. Otherwise, your continued use of the Services, including the website and the mobile application, constitutes your acceptance of such changes. PLEASE CHECK THE WEBSITE REGULARLY TO VIEW THE THEN-CURRENT AGREEMENT."[3]

The most recent TOU was updated on January 17, 2023, and "19. Miscellaneous" states as follows:

"PLEASE NOTE THAT THE AGREEMENT IS SUBJECT TO

---

forth herein.

[3] The Court notes that the first and last sentences are conspicuously in capital letters.

CHANGE BY FACEAPP IN ITS SOLE DISCRETION AT ANY
TIME. When changes are made, we will make a new copy of
the Agreement available at our website and within our mobile
application. We will also update the "Last Updated" date at the
top of the Agreement. If we make any material changes, we
will also send push notification or show a pop-up to you via the
Apps or otherwise in the Services."[4]

The undersigned has no qualms about accepting the 2023 TOU as controlling in
this case. Indeed, both the 2017 and 2019 versions included a change-in-terms
provision - that informed users that defendants had the right to unilaterally modify its
terms, that modified terms would be posted on defendants' website, and that
continued use of defendants' products constitutes acceptance of the modified
terms. See *Kinkel,* 857 N.E.2d at 258 (when a "service agreement ... expressly
reserve[s] the right" of the drafter "to unilaterally modify the terms and conditions of
the agreement, at any time, *without notice,*" and the customer "accepted this
condition" by signing the service agreement, the drafter's right to subsequently
modif[y] the arbitration provision in that agreement ends only when the service
agreement is "terminated" and "no longer in effect.").

## B. Notice/Mutual Assent

Purchase contests that she consented to the agreement and argues that she did
not have notice of same. (Doc. 49, p. 6). In order for there to be a contract between
parties, there must be a meeting of the minds, or mutual assent, which is determined
by an objective standard. *Arbogast v. Chicago Cubs Baseball Club, LLC,* 194 N.E.2d
534, 542 (Ill. App. Ct. 2021).  "[I]t is not necessary that the parties share the same

---

[4] The Court notes that "19. Miscellaneous" is in bold and all capital letters, while the first sentence is
conspicuously in capital letters. There is a second paragraph that discussed effective dates for new users
and current users, and advises users that use of the website and mobile application, "constitutes your
acceptance of such changes."

subjective understanding as to the contract's terms, if their conduct objectively indicates an agreement to the terms of the purported contract." *Id.* Thus, "the parties' overt acts and the communications between them may be considered in determining whether and upon what terms they have entered into a contract." *Id.*

Although complicated to assess, the mutual assent requirement applies in the context of internet transactions. *Sgouros v. TransUnion,* 817 F.3d 1029, 1035 (7th Cir. 2016). The two most common types of online agreements are "clickwrap" and "browsewrap" agreements. *Van Tassell v. United Marketing Group LLC*, 795 F.Supp. 770 (N.D. Ill. 2011).

Defendants contended that users could not launch the application and/or continue to use the service without affirmatively clicking the start button, which advises users that by continuing to use the program, they are agreeing to the privacy policy and terms of use, both of which are also hyperlinked. (Doc. 42, p. 9). Defendants specifically referenced "clickwrap agreements like this agreement," and also referenced text and a hyperlink. (Id.). A clickwrap agreement requires a website user to expressly assent to the website's terms of use by clicking on an "I agree" box after being presented with terms, before continuing with an Internet transaction. *Ambrosius v. Chicago Athletic Clubs, LLC,* 203 N.E.3d 239 (Ill. App. Ct. 2021) (*see* also Ronald J. Mann, *Just One Click: The Reality of Internet Retail Contracting,* 108 Colum. L.Rev. 984, 990 (2008) ("Clickwrap" includes "the following types of interfaces: terms within a frame through which a use must scroll to get to a radio button that must be checked to proceed; terms within a frame and a radio button outside and below that frame that must be checked to proceed; and a statement that the purchase

is subject to terms and conditions, a link to those terms, and a radio button that must be checked to proceed."). Because clickwrap agreements require affirmative action on the part of the user to manifest assent, courts regularly uphold their validity when challenged. *Id.*

To the contrary, Purchase contended that she did not agree to the terms of the purported agreement because the launch page involved a "browsewrap." (Doc. 49, p. 6). A browsewrap agreement binds an individual simply through the use of the app without any active manifestation of assent, and the agreement is enforceable only if the user had actual or constructive knowledge of the terms. *See, e.g.*, *Wilcosky* v. *Amazon.com, Inc.*, 517 F. Supp. 3d 571, 766–67 (N.D. Ill. 2021). The defining characteristic of browsewrap agreements is not that the terms are available via a hyperlink, but instead that the website owner is attempting to bind users to terms and conditions without the user taking any specific action to manifest their assent; a user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a web page exists. *Ambrosius,* 203 N.E.2d at 251 (*citing Be In, Inc. v. Google Inc.* 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013).

More recently, courts have determined the existence of a third-type of internet agreement, the hybridwrap agreement, which arises where the app does not display the full agreement but does provide a hyperlink to the terms and informs the user that by taking a certain action, such as signing up for an account, he is assenting to the agreement. *See, e.g.*, *Anand* v. *Heath*, 2019 WL 2716213, at *4 (N.D. Ill. June 28, 2019). A hybrid agreement may resemble a browsewrap agreement in that the terms

and conditions are only available via a hyperlink, while also resembling a clickwrap agreement in that "the user must do something else ... to assent to the hyperlinked terms." *Wilson v. Redbox Automated Retail, LLC,* 448 F.Supp. 873, 882 (N.D. Ill. 2020) (*Citing Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838 (S.D.N.Y. 2012)).

In support of its motion, FA submitted a declaration of Jayant Ravalis who attested to FA's business records and practices (Doc. 23). Ravalis testified that FA publishes a mobile-device based, photo-editing application that is available on both iOS and Android devices. (Doc. 23, ¶3).

With respect to iOS devices, Ravalis stated the following:

> "5. **iOS Devices.** After a user on the iOS platform downloads the FaceApp photo editor application, FaceApp presents the user with an opening screen displaying a message that informs the user: "By continuing to use FaceApp, you agree to our **Privacy Policy** and **Terms of Use**." The "Privacy Policy" and "Terms of Use" text in this message is underlined and in a different color, bold font as compared to the rest of the message – showing that the text is a hyperlink to FaceApp's Privacy Policy and Terms of Use, respectively. Immediately above this text is a button labeled: "Let's Start." Every FaceApp user must take the affirmative step of clicking that button before proceeding to use FaceApp's functionality, including its functionality to upload and edit photos[5]. (Doc. 23, ¶5).

With respect to Android devices, Ravalis stated the following:

> "7. **Android Devices.** After a user on the Android platform downloads the FaceApp photo editor, FaceApp presents the user with an opening screen displaying a message that informs the user: "By continuing to use FaceApp, you agree to our **Privacy Policy** and **Terms of Use**." The "Privacy Policy" and "Terms of Use" text in this message is in a different color, bold font as compared to the rest of the message – showing that the text is a hyperlink to FaceApp's Privacy Policy and Terms of Use, respectively. Immediately above this text is a button labeled: "Let's get started." Every FaceApp user must take the affirmative step of clicking that button before proceeding to use

---

[5] The undersigned notes that a picture accompanied the declaration. (Doc. 23, ¶6). The picture depicted the varying fonts and the undersigned notes that the "Let's Start" button was in blue.

FaceApp's functionality, including its functionality to upload and edit photos.[6]" (Doc. 23, ¶7).

Based upon the totality of the evidence – the declaration of Ravalis, the photographs, as well as the hearing testimony – the Court finds the agreement at issue to be a hybridwrap. After conducting a fact intensive objective inquiry, the undersigned further finds that defendants provided Purchase with reasonable notice that her use of the application constituted assent to an agreement. Indeed, the language itself clearly stated that further use constituted her assent to the privacy policy and TOU, both of which were set forth via hyperlink in a bold (and underlined for iOS users) font. *See Sgouros v. TransUnion, Corp.,* 817 F.3d 1029, 1035 (7th Cir. 2016). The click button to start was also conspicuously blue it was right above the hyperlinks. *Sgouros,* 817 F.3d at 1036.

## C. Ambiguities

In her supplemental response to the motion, Purchase attempted to distinguish this case from other BIPA cases in which arbitration was compelled claiming ambiguities existed. For example, Purchase referenced the three variations of TOUs; however, this Court previously contended *infra* that Illinois courts have repeatedly recognized the enforceability of arbitration provisions added via a unilateral change-in-terms clause. *See, e.g.*, *Williams v. TCF Nat'l Bank*, 2013 WL 708123, at *6, 9 (enforcing revised arbitration provision added via a change-in-terms clause); *Sherman v. AT&T Inc.*, 2012 WL 1021823, at *4 (N.D. Ill. Mar. 26,

---

[6] The undersigned notes that a picture accompanied the declaration. (Doc. 23, ¶8). The picture depicted The picture depicted the varying fonts and the undersigned notes that the "Let's Start" button was in blue.

2012) (enforcing revised arbitration agreement because "[t]he Court finds that [the plaintiff] agreed to a contract with a change-in-terms).

Additionally, there is no ambiguity as to whom the operative TOU dated January 17, 2023 binds. *See Thompson v. Gordon,* 948 N.E.2d 39, 47 (Ill. 2011) (If the language of a contract is susceptible to more than one meaning, it is ambiguous). Notwithstanding the foregoing, were it ambiguous, the undersigned could consider extrinsic evidence to determine intent. *Gallagher v. Lenart,* 874 N.E.2d 43, 58 (Ill. 2007).   The TOU advises that it applies to access and use of faceapp.com and mobile applications. Additionally, the TOU was attached as an exhibit in response to FA's motion (Doc. 24-1) for arbitration and was incorporated by reference in FTL's motion (See Doc. 34). Moreover, the TOU indicates that it was provided by FaceApp Technologies Limited, its beneficiaries, and affiliates. (Doc. 24-1).

Defendants have satisfied the first step of the inquiry – Purchase entered into a written agreement to arbitrate her claims.

### Scope of the Mandatory Arbitration Agreement

Even though the Court has determined that a valid written agreement existed, Purchase contends that her claims fall outside the scope of said agreement. (Doc. 49, p. 10). Section 12 of the applicable TOU is entitled, "Dispute Resolution", with subsection 12A entitled, "Binding Arbitration Agreement – United States Users."

The arbitration provision within the TOU contains a provision entitled "Authority of Arbitrator", which is commonly referred to as the arbitrability inquiry, and that begins as follows:

"The arbitrator shall have exclusive authority to (a) determine the

> scope and enforceability of this Arbitration Agreement and (b) resolve any dispute related to the interpretation, applicability, enforceability or formation of this Arbitration Agreement, including, butnot limited to, any assertion that all or any part of this Arbitration Agreement is void or voidable."

As such, this question is for the arbitrator, not for the undersigned. Indeed, the Supreme Court has held that "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument applies to a particular dispute is wholly groundless". *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 586 U.S. 63, 68 (2019). The arbitration agreement further advises that "[t]he arbitration will be resolved through confidential binding arbitration by the Judicial Arbitration and Mediation Services ("JAMS"), an established alternative dispute resolution provider, which further suggests that the parties intended to submit all issues of arbitrability to the arbitrator.

### Refusal to Arbitrate

Although Purchase did not address this issue, it is the final element the under the FAA to compel arbitration and her actions convey refusal. Defendants have asserted that Purchase refused to arbitrate her claims, and this Court concurs. Obviously, Purchase filed this claim on August 8, 2023. (Doc. 1). Moreover, as reflected in the declaration of Viktor Dindzans, one of defendants' attorneys, "On October 10, 2023, I met and conferred with Plaintiff's counsel concerning (among other things) the applicability of the mandatory arbitration agreement in FaceApp's Terms of Use Agreement." (Doc. 24, ¶4). After providing copies of the TOU and requesting an

additional meeting, plaintiff's counsel refused, saying, "We understand your position regarding the terms but believe we have properly filed this case in federal court and will let the court decide. Therefore, we do not think further discussion of this issue would be beneficial." (Doc. 24, ¶6).

## II.    MOTIONS TO DISMISS

As stated previously, defense counsel has withdrawn the alternative motions to dismiss. Accordingly, this Court will not address said arguments.

## III.    STAY

The Federal Arbitration Act ("FAA") allows one party to an arbitration agreement to ask the court to put the litigation on hold and force the other party to arbitrate the disputes. 9 U.S.C. § 4. Indeed, Sections 3 and 4 of the FAA describe procedures through which federal courts implement arbitration agreements, stating that courts "shall" stay proceedings and order arbitration upon confirming the existence of an enforceable arbitration agreement that covers the dispute at hand. 9 U.S.C. §§ 3,4. As such, a party moving for arbitration also implicitly seeks a stay of judicial proceedings.

Notwithstanding the foregoing, the Court has the inherent authority to stay proceedings to "control the disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). This authority exists even in the absence of a procedurally valid motion to stay. See *Clinton v. Jones*, 520 U.S. 681, 706 (1997) (discussing district courts' "broad discretion to stay proceedings as an incident to its power to control its own docket"); *Jackson v. Van Kampen Series Fund, Inc.*, No. 06-CV-944, 2007 WL

1532090, at *2 (S.D. Ill. May 24, 2007) (holding that court's inherent authority "includes the power to stay proceedings *sua sponte*."). As such, this Court will stay further proceedings in this matter pending a decision from the arbitrator.

CONCLUSION

For the reasons set forth above, Defendants' Motions to Compel Arbitration (Docs. 22, 34) are **GRANTED,** but and the alternative Motions to Dismiss are terminated as moot due to withdrawal by defense counsel. As set forth *infra*, all further proceedings in this matter are **STAYED** pending arbitration. The parties are **DIRECTED** to file a report advising the Court of the status of the arbitration proceeding on or before April 1, 2025.

**IT IS SO ORDERED.**

**DATED:  September 12, 2024**

> */s/ Stephen P. McGlynn*
> **STEPHEN P. McGLYNN**
> **U.S. District Judge**